UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

    JEFFREY L. WILLIAMS                  CASE NO. 05-70487

                         Debtor                  Chapter 13
--------------------------------------------------------
APPEARANCES:

LYNN HARPER WILSON, ESQ.
Staff Attorney for Chapter 13 Trustee
250 South Clinton Street, Suite 203
Syracuse, NY 13202

RICHARD P. RUSWICK, ESQ.
Attorney for Debtor
401 E. State St., Suite 306
Ithaca, NY 14850

HAROLD W. MC GILL
Pro Se Creditor
11 Kentucky Ave.
Trumansburg, NY 14880


Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge


**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**

      Under consideration by the Court is confirmation of the Chapter 13 Plan, originally filed on October 27, 2005, by Jeffrey L. Williams ("Debtor") and subsequently amended on March 7, 2006. On March 7, 2006, an objection was filed by the chapter 13 trustee, Mark W. Swimelar, Esq. ("Trustee") concerning the feasibility of the Debtor's Plan, as originally filed. The Trustee requested information concerning the value of the Debtor's insurance agency, listed in his

Schedule B - Personal Property, with a value of "0."[1] On April 6, 2006, an objection was also filed by a creditor, Harold W. McGill ("McGill").

The hearing on confirmation of the Debtor's Amended Plan was held on April 11, 2006, and adjourned to May 9, 2006, in Binghamton, New York. In the interim, on May 1, 2006, the Trustee filed a supplemental objection to confirmation, arguing that the Amended Plan fails to satisfy the liquidation test set forth in § 1325(a)(4) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 ("Code"). Following oral argument at the hearing on May 9th, the Court scheduled an evidentiary hearing to be held on July 24, 2006. The hearing was adjourned on the consent of the parties to September 11, 2006, in Utica, New York. Following testimony of several witnesses, the Court afforded the parties an opportunity to file memoranda of law. The matter was submitted for decision on September 29, 2006.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1) and (b)(2)(A), (B), (L) and (O).

## FACTS

The Debtor filed a voluntary petition ("Petition") pursuant to chapter 13 of the Code on

---

[1] In Schedule B, Debtor indicated that the "[v]alue given is based upon liquidation in Chapter 7 and does not include equipment which is listed separately."

October 11, 2005. His original Plan provided for monthly payments of $531 over a period of 60 months at an anticipated dividend of not less than 6.0%. As noted previously, on March 7, 2006, he filed an Amended Plan, which provides for three monthly payments of $531 and 57 monthly payments of $550 at an anticipated dividend of not less than 6.8%.

McGill objected to the confirmation of the Amended Plan based on the values of several items of personal and real property listed by the Debtor in his schedules. At the evidentiary hearing, McGill indicated that his primary objection concerned the value the Debtor placed on his business, the Williams Insurance Agency ("Agency"). Based on the Debtor's representation that the Agency's gross income from commissions in 2003 was approximately $150,000, McGill argued that the industry standard in determining the market value of insurance agencies at a minimum is one and a half times the gross commissions/earnings or $225,000.

The Debtor testified that he had been in the insurance business for approximately 43 years. As of the petition date, the Agency was operated out of two locations, one in Ovid, New York, and the other in Jacksonville, New York. According to the Debtor, he acquired an insurance business in Ovid, New York, from McGill in September or October 1994 or 1995. McGill testified that his annual gross earnings at that time had been approximately $90,000 and, although he originally had suggested a selling price of one and a half times gross earnings or $135,000, he and the Debtor had reached an agreement of $101,000. He explained that at the time he was "under the gun" to sell the business because he owed payroll taxes to the Internal Revenue Service ("IRS"), and he believed that it would take over the agency if he was unable to pay the IRS. Under the terms of the agreement with the Debtor, McGill testified that the Debtor had paid $2,500 to the IRS as a deposit and had agreed to pay the IRS $500 per month and McGill $376

per month for a period of 60 months.

According to the Debtor, he purchased an insurance business located in Trumansburg, New York, from Melinda Stevenson ("Stevenson") in December 1997. Stevenson testified that she sold the business to the Debtor for $90,000 or approximately one and a quarter times the gross earnings of the prior year. It was her testimony that the Debtor had made a down payment of $1,500 and had paid an additional $13,500 at the closing. The balance of $75,000 was to be paid over 10-15 years. In both cases, the sellers had executed covenants not to compete for a period of three years in the case of Stevenson and five years in the case of McGill.

The Trustee offered the testimony of Jerome True ("True"), an insurance agent and owner of several insurance businesses in the Ithaca, New York area. He testified that he had purchased eight insurance agencies and was in negotiations with two or three others at the time of the hearing. The first agency he purchased was in Newfield, New York, in 1979, at a purchase price of approximately $200,000, payable over ten years. He purchased a second business in 1982, located in Ithaca, New York. He could not remember the purchase price, but he testified that it was valued based on a multiple of three times gross annual earnings. He also testified that it was paid off within three years.

He acknowledged that all of his purchases had included covenants not to compete. He explained that in all cases he had confirmed the stream of income. He testified that the value of an insurance business is generally calculated using a scale of between one and three times the annual earnings. Other considerations for him included whether or not he already had a relationship with some of the companies with whom the seller had contracts and the likelihood of retention of current customers of the seller. He explained that renewals are crucial in the

insurance business and that one hopes for an average of 85-90% in renewals of policies with current customers.

True was asked hypothetically whether he would be interested in purchasing the Agency. He replied that it would be necessary for him to first perform some due diligence. He testified that he might be willing to purchase it and expressed the view that two times annual earnings would be an appropriate price for the Agency even if it was part of the bankruptcy estate and even if he were unable to obtain a covenant from the Debtor not to compete.[2]

The Debtor confirmed that he had received 1099s ("information returns") for 2004 totaling $162,214. He could not explain the discrepancy between that figure and the $118,899 in gross receipts listed on Schedule C, "Profit or Loss from Business," on his 2004 Federal tax return. *See* Debtor's Exhibit 9. Debtor's gross income for the 12 months prior to filing is listed as $122,478. *See* Debtor's Exhibit 2, "Business Income and Expenses." It was the testimony of the Debtor that he listed the value of the Agency as "0" because he felt that if the Agency was forced into liquidation in a chapter 7, the companies would cancel their contracts with the Agency and there would be no "book of business" to sell.

The Debtor provided copies of five of the agreements he had with various insurance companies. The agreement with Drive[3], which was made effective March 20, 2006, provides that

---

[2] The question was asked in the context of a sale of the Agency by a trustee who arguably would be unable to compel the Debtor to enter into such an agreement not to compete.

[3] According to the agreement with Drive, the legal names of the insurance company includes "National Continental Ins. Company, Progressive Casualty Insurance Co., Progressive Northeastern Ins. Co., Progressive Northern Insurance Co. Progressive Northwestern Ins. Co., Progressive Specialty Insurance Co. and United Financial Casualty Company." *See* Debtor's Exhibit 3 at pg. 7.

6

it is to remain in effect unless otherwise terminated. *See* Debtor's Exhibit 3. Advance notice of termination is not required in the event that the Agency were to fail to remit monies due and owing the company or the Debtor abandoned the business or his license was suspended or revoked, etc. *Id.* at ¶ VI.C. There is no mention of bankruptcy or insolvency as a basis for termination. Indeed, the agreement with Drive was executed with the Debtor postpetition. The agreement with Drive provides that the company "may" terminate the contract upon abandonment and also gives the company discretion as to whether or not to pay commissions or renewals as a percentage of earned premiums. *Id.* at ¶ VII.A.5.

In the agreement that the Debtor has with AIG, dated January 1, 2001, one reason for "Termination for Cause" included "abandonment, fraud, insolvency, bankruptcy, or gross and willful misconduct of Agent." *See* Debtor's Exhibit 4 at ¶ 16(d). The agreement provides that the company "may notify policyholders of the termination of this agreement." *Id.* In addition, the company was also given the option to assume ownership of all policies and to sell or assign them to another agent in the event of termination "with cause." *Id.* at ¶ 17.

According to the terms of the Debtor's agreement with Ontario Insurance Company, entered into postpetition in August 2006, it was to terminate "[i]mmediately upon either party giving written notice to the other in the event of abandonment, fraud, revocation, insolvency, failure to pay monies due to the Company, gross and willful misconduct or negligence on the part of such other party." *See* Debtor's Exhibit 5 at ¶ XI.A.4. It also provides that in the event of termination, "[t]he Agent's records, use and control of expirations . . . shall remain the property of the Agent . . . provided that Agent has then rendered and continues to render timely accounts and payments of all amounts due the Company . . . ." *Id.* at ¶ XI.D.1.

7

A fourth agreement, allegedly with Kemper Insurance, is unsigned and undated. *See* Debtor's Exhibit 6. It provides that the agreement would terminate "[i]mmediately upon written notice to You in the event of fraud, insolvency or gross and willful misconduct on Your part." *Id.* at ¶ 10.1.1. It also provides that the records and "expirations" would remain property of the Agency even upon termination. *Id.* at ¶ 11. However, if the agent were to abandon the agency business, the company has the discretion to have the records and use and control of the expirations vest in the company. *Id.*

Debtor also provided a copy of an agreement between the Agency and Allstate, executed postpetition on February 28, 2006. *See* Debtor's Exhibit 7. In that agreement, "cause for termination" includes breach of the Agreement, fraud, forgery, misrepresentation, conviction of a felony . . . " *Id.* at ¶ X.4. It makes no mention of insolvency or bankruptcy as being "cause" for termination.[4] The agreement also provides that the Agency's records and the "use and control of expirations . . . shall remain in the undisputed possession and ownership of the Agency, except * * * if the Agency has not satisfied any debt owed to the Company . . . ." *Id.* at ¶ III.E. and F. In the event of termination, the company also agrees to "use reasonable business judgment in selling such expirations and shall be accountable to the Agency for any sums received which, net of expenses exceed the amount of indebtedness [to the Company]." *Id.* at ¶ III.G.

---

[4] According to the provisions set forth in the agreement with Allstate, dated February 28, 2006, the possibility of profit sharing existed. *See* Debtor's Exhibit 7. However, there is no evidence to indicate whether the Debtor had a similar contract with Allstate prepetition and whether he was entitled to any profit sharing based on prepetition policies with Allstate, which arguably would constitute property of the estate to be considered pursuant to Code § 1325(a)(4).

## DISCUSSION

In connection with confirmation of a chapter 13 plan, the Debtor has the burden of proof to establish all requisites for confirmation, including the requirement set forth in Code § 1325(a)(4). *In re Hutchinson*, Case No. 05 43445 13, 2006 WL 2848654, *5 (Bankr. D.Kan. Oct. 5, 2006). Code § 1325(a)(4) requires that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date. 11 U.S.C. § 1325(a)(4). The courts refer to this provision as "the best interests of creditors test." It is a hypothetical test requiring the Court to examine the value of nonexempt property of the estate that would be available to a chapter 7 trustee for distribution to the unsecured creditors. Code § 541 defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

Congress intended § 541 to be interpreted broadly. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983). The nature and extent of the Debtor's interest in property is determined by applicable non-bankruptcy law. *Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1101 (2 Cir.1990). In this case, we are concerned with the value of the Agency, including the insurance renewals or "expirations" or what has been referred to as the "book of business." As noted by one court,

> [t]he "book of business," also known as "expirations" or "renewals," has a definite and well recognized meaning in the insurance industry. "[I]t embodies the records of an insurance agency . . . . This information enables the agent to

contact the insured before the existing contract expires and arms him with the information essential to secure another policy and to present to the insured a solution for his insurance requirements."

*Texas Truck Ins. Agency, Inc. v. Cure (In re Dunham)*, 110 F.3d 286, 287 (5th Cir. 1997), citing *Matter of the Estate of Erastus Corning II*, 108 A.D.2d 96 (N.Y. App. Div. 1985). The court in *Corning* noted that a "'book of business' constitutes a valuable asset in the nature of good will." *Id.* at 102; *see also St. Paul Fire & Marine Ins. Co. v. Roy A. Dart Ins. Agency, Inc. (In re Roy A. Dart Ins. Agency, Inc.)*, 5 B.R. 207, 209 (Bankr. D. Mass. 1980) (indicating that it is of "vital assistance to the agency in carrying on the insurance business and is recognized as a valuable asset in the nature of goodwill. (citation omitted) * * * In essence, the 'expirations' of an insurance agency represent the major portion of the actual value and goodwill of the agency business"). The bankruptcy court in *Cure* found that it represented what it described as a "bundle of property rights." *Cure*, 110 F.3d at 288. The Fifth Circuit Court of Appeals went on to conclude that "[r]enewals are clearly property, and they are a transferrable asset of an insurance company." *Id.* at 289. In addition, the commissions that the Debtor is to receive on those policies in effect at the time of the bankruptcy filing are also property of the estate to the extent that their receipt is not dependent on any postpetition services of the Debtor. *See In re Wu*, 173 B.R. 411, 413-15 (9th Cir. BAP 1994); *see also In re Bluman*, 125 B.R. 359, 366 (Bankr. E.D.N.Y. 1991) (finding that commissions received by debtor following the prepetition sale of his insurance agency, which were not conditioned on future services of the debtor, were property of the estate).

In the Debtor's schedules, he listed $1,200 in accounts receivable as an asset, which he testified represented the commissions earned in the month prior to filing for which no payment had been remitted by the companies. In applying the "best interests of creditors test" in the

10

context of a hypothetical chapter 11 case, the earnings or accounts receivable not attributable to the Debtor's personal postpetition services are also considered property of the estate. *Wu*, 173 B.R. at 413-14, citing *In re FitzSimmons*, 725 F.2d 1208 (9th Cir. 1984).

According to the agreements with Ontario Insurance Company and Kemper, both companies were to bill the policyholders directly. It would appear that unless there was a claim made with the Debtor, that his services may not have been required until the policy came up for renewal. Thus, any commissions based on those monthly premiums or accounts receivable would be property of the estate to the extent that the policies existed on the date of filing. *See In re Tomer*, 147 B.R. 461, 472-73 (S.D. Ill. 1992) (finding that the "debtor's entitlement [to commissions] is clearly rooted in the pre-bankruptcy period when the policies are issued" and is, therefore, property of the estate). The court in *Tomer* determined that the entitlement to the commissions was not contingent on the performance of any future personal services of the debtor. *Id.* at 473.

Obviously, there are many factors to be considered in connection with a Code § 1325(a)(4) analysis when one is dealing with a bankruptcy estate of an independent insurance agent such as the Debtor. Of particular concern at the evidentiary hearing was the value to be placed on the business itself from the perspective of a hypothetical chapter 7 trustee. The Trustee offered testimony concerning the value of the Agency based on its annual gross earnings in 2004.

True testified that the standard in the industry indicates a value of between one and three times the annual gross earnings. In *In re Cutler*, 778 N.E.2d 762, 765 (Ill. App. Ct. 2002), one of the valuation experts found, upon researching the issue, that the "rule of thumb" in the case of independent agencies was to use multiples ranging between 1 and 1.7 times gross revenues in

connection with the valuation and sale of such insurance agencies. The appellate court found such multiples inapplicable in that case because the subject agency was a "captive agency," which had an exclusive arrangement with Geico, rather than an independent or "multiline" agency. At the trial, there was testimony to the fact that unlike multiline agencies, captive agencies were not marketable. *Id.* at 764. Ultimately, the appellate court concluded, in that case, that the value for purposes of equitable distribution was $32,000, as compared to the figure of $243,000 found by the trial court. *Id.* at 768.

In this case, the Debtor is an independent insurance agency with contracts with a number of different companies. True testified that in his opinion, the Agency was worth two times the annual gross earnings despite the fact that the Debtor was in bankruptcy. This would place the value of the Agency at a minimum of $244,956 based on the earnings of the Agency over the 12 months prepetition. Given the testimony of McGill and Stevenson that the Debtor had purchased their businesses for a total price of $191,000 approximately ten years ago, this appears to be a reasonable figure.

The Debtor asserts that the testimony should not be considered by the Court because it was based on valuation of the Agency as a going concern, which the Debtor contends would not be the case in a chapter 7. The Debtor points out that the agreements with the insurance companies require that the agent be licensed to sell insurance. A chapter 7 trustee certainly cannot compel a debtor to continue servicing the accounts and, in the view of the Court, it is unlikely that a chapter 7 trustee would be licensed to sell insurance. In addition, the Debtor contends that the insurance companies have the right to terminate the agreements with or without cause, including the liquidation of the Agency.

The Court recognizes that in a chapter 7 case, the principal duty of a chapter 7 trustee is to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(1). However, Code § 721 also allows bankruptcy courts to authorize a chapter 7 trustee to operate the debtor's business for a limited period of time if operation of the business is in the best interest of the estate and consistent with an orderly liquidation. 11 U.S.C. § 721. In this case, the agreements with the Debtor generally allow for the transfer/assignment of the policies to another agent provided that the written consent of the companies is obtained. There is certainly nothing to prevent a chapter 7 trustee from employing a licensed insurance agent to manage the accounts postpetition, with the consent of the companies, while the trustee proceeds to market the asset. Obviously, in connection with his negotiating the sale of the debtor's "book or business," a chapter 7 trustee cannot compel a debtor to enter into a covenant not to compete. However, True testified that he did not believe this would negatively impact the value of the business to any great degree.

The Debtor also directs the Court to the testimony by True, McGill and Stevenson in which they indicated that it is difficult to obtain financing from a bank to purchase an insurance agency. Instead, the sale requires an initial down payment and then payments over time. In the case of McGill, that was five years and, in the case of Stevenson, that was ten to fifteen years. With respect to the three purchases of insurance businesses to which True testified, he indicated that they were to be paid off over a range of three to ten years. Chapter 7 trustees oftentimes negotiate with other parties for payment over time, whether it is for the purchase of property of the estate or in settlement of the trustee's efforts to recover property of the estate. The Court does

13

not view this as a deterrent in connection with a hypothetical sale of the Agency by a chapter 7 trustee.

The Debtor argues that some of the agreements with the companies provide for their termination in the event of insolvency or bankruptcy. This argument is weakened somewhat, however, when one considers that at least three of the agreements entered into evidence by the Debtor were executed with the Debtor postpetition when he was still in bankruptcy. Also the language of some of the agreements makes it clear that they provide the companies with a great deal of discretion in deciding whether to terminate their relationship with the Agency.

The Court recognizes that factors exist that would make it difficult, but certainly not impossible, for a chapter 7 trustee to sell the Agency for a reasonable price. However, this is not a chapter 7. It is a chapter 13, and Code § 1325(a)(4) requires only that the Court consider the value of the Debtor's nonexempt assets in the context of a <u>hypothetical</u> chapter 7 case. As noted previously, it was the Debtor's burden to establish to the satisfaction of the Court that the Agency was only worth "0." Based on the evidence presented and using a multiplier of "one" in the context of this bankruptcy case, the Court is of the opinion that the Agency has a value of at least $122,478, based on the gross income for the 12 months prepetition, without taking into consideration the value of other assets such as the existing accounts receivable.

Based on the foregoing, it is hereby

ORDERED that the confirmation of the Debtor's Amended Plan is denied based on his failure to establish that it complies with Code § 1325(a)(4).

14

Dated at Utica, New York

this 15th day of November 2006

/s/   Hon. Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge